**BASEBALL, INC., Appellant–Defendant,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Appellee–Plaintiff.**

No. 71A04–9606–CV–236.

Court of Appeals of Indiana.

Nov. 20, 1996.

Debra Voltz–Miller and Fred R. Hains, South Bend, for Appellant–Defendant.

Pamela Carter, Attorney General of Indiana and Terry G. Duga, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Baseball, Inc., (Baseball), appeals the trial court's decision affirming the Indiana Department of Revenue's (Department) revocation of Baseball's bingo license.

We affirm.

### ISSUES

1. Whether Baseball was denied due process when the Department terminated its bingo license on an emergency basis.

2. Whether Baseball was denied due process when an attorney for the Department served as both advocate for the department and hearing officer at the administrative review of Baseball's license revocation.

3. Whether the hearing officer impermissibly admitted double hearsay.

4. Whether the trial court's findings of fact exceeded the scope of its authority upon judicial review.

5. Whether the trial court erred in refusing to allow the Department's hearing officer to testify at the judicial review of the Department's affirmation of the emergency bingo license revocation.

6. Whether the trial court erred in determining Baseball was not a qualified organization under Ind.Code 4–32–6–20(a)(1)(A) and (C).

### FACTS

Baseball, Inc. is a not-for-profit organization incorporated in 1984 for the purpose of the promotion of baseball in Michigan City and Indiana. Apparently, Baseball's sole source of revenue was a charity gambling operation offering bingo, pull tabs, punch boards and tip boards at the headquarters which it owns located at 3900 Lincoln Way West, South Bend, Indiana. Although Baseball was licensed by the Department to engage in all four of the above-mentioned games, its principal activities were bingo and the sale of pull tabs. Baseball was comprised of no more than 13 executive members who are members for life and an unlimited number of general members.

Baseball's officers included Commissioner Alan Shinn, President Robert Van Scyoc, Vice President William Nasser and Secretary/Treasurer Joseph Oletti. Located within the building at the 3900 Lincoln Way West address along with Baseball were seven other satellite companies which paid nothing for rent, utilities, or maintenance. These businesses included Brentwood Ad Agency, N.W. Maintenance, Big Four Asphalt, Shinn Construction, Communication Audio and Electronics, Triple A Security, and B. & H. Hardware and were all owned by Baseball officers, relatives of Baseball officers, or members of Baseball.

During 1993 and 1994, Baseball made large payments to six of these companies for services rendered. As to B. & H. Hardware, Baseball made it a substantial loan which has never been repaid. Many of Baseball's volunteer bingo workers received paychecks from one or more of the aforementioned companies. Some of these workers are employed by the companies and work as bingo volunteers for Baseball. Others are not employees of the companies and have no explanation for the paychecks other than that they believed they were being paid to work at the bingo games. The owners of the companies had no explanation for these paychecks.

After an investigation spanning the approximate time period of July 1993 to November 1995, the Department revoked Baseball's license on an emergency basis and imposed fines totaling $36,500.00 as of January 11, 1996. At the administrative appeal of the emergency revocation, Anne Holden, an attorney with the Department, served as both hearing officer and advocate for the Department over Baseball's objection. The Department issued a letter of findings dated

February 5, 1996, wherein it sustained the following violations alleged in the emergency license revocation notification: 1) Baseball was not a qualified organization, 2) its volunteer workers were illegally paid, 3) it used bingo proceeds illegally, 4) it allowed a volunteer to participate in a bingo game, 5) it sold pull tabs that did not meet standards set by statute and regulations, and 6) it illegally acted as distributor of bingo supplies.

Judicial review of the Department's findings and conclusions was conducted on February 26, 1996. The trial court issued its findings on March 12, 1996, finding the evidence sufficient to support all of the Departments' findings with the exception of the finding that Baseball illegally distributed bingo supplies.

Additional facts will be presented throughout our discussion of the issues.

*1. Emergency Termination of Bingo License*

██ Baseball first argues that the Department "denied Baseball, Inc. its right to due process by terminating its bingo license on an emergency basis." Brief of Appellant at 32. There is no constitutional right to gamble. *Lewis v. United States,* 348 U.S. 419, 423, 75 S.Ct. 415, 418, 99 L.Ed. 475 (1955). Furthermore, this court has stated that Indiana has a legitimate interest in regulating gambling through its exercise of the police power. *Dept. of Revenue v. There To Care, Inc.,* 638 N.E.2d 871, 874 (Ind.Ct.App. 1994), *trans. denied.* To that end, the State has enacted the following which govern the revocation of Baseball's bingo license:

Ind.Code 4–32–8–2 provides:

If the department proposes to terminate the license of an organization, a distributor or manufacturer, the entity may continue to operate under the license until the department has made a decision and all administrative appeals have been exhausted by the entity. However, the right to continue to operate after the entity's receipt of the department's decision does not apply to an entity if the department declares in the decision to terminate the license that an emergency exists that requires the immediate termination of the license.

Ind.Code 4–32–8–3 provides:

The department shall adopt rules under IC 4–22–2 [1] concerning when an emergency exists that requires the immediate termination of a license under section 2 of this chapter.

45 IAC 18–6–3 provides for the revocation of Baseball's bingo license as follows in pertinent part:

(a) The proposed action of the department to impose a civil penalty under this article is subject to review under IC 6–8.1. However, the licensee has only seventy-two (72) hours from its receipt of the decision, or other action to file a written protest. Except as provided in subsection (b), as long as the matter is under protest, the licensee can continue to operate until all administrative appeals have been exhausted.

(b) The department may determine at any time that an emergency exists that requires the immediate termination of a license. Effective with the receipt of the department's decision to terminate its license, a licensee must cease all operations that were previously authorized under the license.

(c) An emergency requiring the immediate termination of a license will be deemed to exist under any of the following circumstances:

(1) The information provided on the application for license is found to be false or misleading.

(2) The appropriate fees are not paid.

(3) An entity other than the qualified organization is conducting the allowable event.

(4) The qualified organization is exceeding its allowable expenditures with respect to an allowable event.

(5) The qualified organization is exceeding the number of days that it can conduct an allowable event.

(6) The organization has conducted an allowable event to the same place and on

---

1. Ind.Code 4–22–2 generally provides for the adoption of administrative rules.

the same day as another qualified organization.

(7) Net proceeds are being used for purposes other than the lawful purposes of the organization.

(8) Accurate reports are not being filed with the department in a timely manner.

(9) Receipts and expenditures from an allowable event are not being kept in a separate and segregated account set up for that purpose.

(10) An allowable event is being held in a county other than where the qualified organization's principle office is located.

(11) An operator or owner does not meet the requirements of IC 4–32.

(12) Prizes awarded are exceeding the limitations imposed by IC 4–32.

(13) Any other violation of IC 4–32 or this article considered to be of a serious nature by the department.

■ Without citation to authority, Baseball claims "[n]one of these rules are of an urgent nature requiring emergency termination and therefore, do not distinguish between *normal* termination that is protected by the due process available under IC 4–32–8–2 and the *emergency*, termination envisioned by the legislature under IC 4–32–8–3." Brief of Appellant at 34 (emphasis in original). Baseball then posits that "[s]ince the rules developed by the [Department] exceed the enabling statute, they are invalid." Brief of Appellant at 35.

As noted, Baseball offers no authority for the proposition that the criteria listed in 45 IAC 18–6–3(c) are "normal," as opposed to emergent criteria requiring license revocation upon notification. Stated another way, Baseball offers no cogent argument for why the above-listed circumstances should not be considered by the Department to be "of an urgent nature." Given the fact that the legislature clearly delegated complete authority to the Department to "adopt rules ... concerning when an emergency exists that requires the immediate termination of a license ...," and given the fact that we may not

construe a statute when its plain language is unambiguous, *There To Care* 638 N.E.2d at 873 (Ind.Ct.App.1994), we find no merit to Baseball's argument that the rules promulgated by the Department "exceed the enabling statute" under these circumstances. As a result, Baseball's apparent contention that it was entitled to the "due process" under the first part of IC 4–32–8–2, which merely provides the entity with the opportunity to "continue to operate under the license until the department has made a decision and all administrative appeals have been exhausted by the entity" unless an emergency exists, must fail as well.

■ Moreover, we disagree with Baseball's final, and wholly unsupported, contention that because "[t]he [Department] not only failed to define rules that provided ascertainable standards for conduct which would provide notice of activities that would require immediate termination of a bingo license, the [Department] had no reasonable basis for their action." Brief of Appellant at 36.

Baseball fails to indicate why the criteria listed in 45 IAC 18–6–3(c) are unascertainable standards of conduct and how they fail "to provide notice of activities that would require immediate termination of a bingo license." To the contrary, a reading of the listed criteria plainly reveals, for example, that the Department will deem an emergency requiring the revocation of a bingo license to exist when: "[a]n operator or worker does not meet the requirements of IC 4–32." 45 IAC 18–6–3(c)(11). At the time of Baseball's license revocation, Ind.Code 4–32–9–25 prohibited an operator or worker from receiving remuneration for conducting or assisting in conducting a bingo game.[2] Steve Englert, the administrator of the Department's compliance division, testified that the emergency in this case existed "[b]ecause we felt the fact that workers were being paid." (R. 629). The record is replete with literally hundreds of pages of exhibits such as ledger sheets, canceled checks, and affidavits indicating

---

**2.** Effective July 1, 1996, IC 4–32–9–25 was amended to additionally prohibit an operator or worker from receiving remuneration for preparing for, cleaning up after, or taking any other action in connection with a bingo game.

that various "volunteer" bingo workers were paid for their work at bingo games.

Under the circumstances, we cannot say the Department denied Baseball its right to due process by revoking its bingo license on an emergency basis.

### 2. Advocate and Hearing Officer

■ Anne Holden, a Department attorney, served as both the representative of the Department and hearing officer over Baseball's objection at the hearing on Baseball's administrative appeal of the emergency revocation of its bingo license. As a result, Baseball now claims the Department "failed to provide Baseball, Inc. with the basic due process protections during the administrative appeal of the Notification of Findings when they refused to provide a neutral hearing officer." Brief of Appellant at 36. In support of its contention, Baseball cites *Rynerson v. City of Franklin,* 655 N.E.2d 126 (Ind.Ct.App.1995), without analysis.

The *Rynerson* facts, however, are inapposite to those before us. There, this court held unconstitutional the statutory provision allowing a city attorney who serves as a member of a third class city's Board of Public Works and Safety to temporarily resign that position so that he or she may prosecute a disciplinary action before the Board. Here, Baseball does not specifically challenge a statutory provision and, furthermore, Baseball complains of the Department providing one attorney to serve as both representative of the Department and hearing officer—as opposed to one attorney acting only as a representative.

The State correctly points out in its Appellee's brief that Baseball's reliance on *Rynerson* is misplaced because our supreme court vacated this court's decision in *Rynerson v. City of Franklin,* 669 N.E.2d 964 (Ind.1996), holding that "the procedure in Ind.Code 36–8–3–4, which permits a city attorney who is a member of a city public works and safety board to prosecute police and fire discipline cases before the board so long as the attorney does not participate as a board member in any police or fire disciplinary proceedings, does not violate due process." *Id.* at 965–66. Baseball does not respond in its Reply brief

to the State's assertion and, because it is axiomatic that we will not formulate a more relevant argument on Baseball's behalf, we cannot say that Baseball was denied due process of the law.

In any case, the legislature has provided in Ind.Code 4–32–8–1 that the administrative process used to resolve tax related issues by the Department under Ind.Code 6–8.1 will be used to resolve charity-gaming issues, and this fact was specifically recognized by this court in *Portland Summer Festival v. Dept. of Rev.,* 624 N.E.2d 45 (Ind.Ct.App.1993), *reh'g denied, trans. denied.* Ind.Code 6–8.1–5–1 explains the procedures the Department is to use when addressing these issues. This provision neither prescribes nor proscribes the protocol the Department must follow in supplying representatives and hearing officers.

However, the Department has promulgated rules affecting I.C. 6–8.1–5–1 which are found at 45 IAC 15–5–3. Notably, 45 IAC 15–5–3(b)(7) provides:

> The hearing will be conducted in an informal manner. The purpose of the hearing is to clearly establish the taxpayer's specific objections to the assessment and the reasoning for these objections. The hearing is not governed by any rules of evidence. The department is expressly excluded from the requirements of the Administrative Adjudication Act.

Given the fact that the informal administrative hearing's purpose was to clearly ascertain Baseball's protest to the revocation of its bingo license, and given the fact that Baseball does not contend that actual or perceived bias on Holden's part kept it from thoroughly presenting its protest to the emergency revocation and reasons therefor, we cannot say Baseball was denied due process under the circumstances as it was freely permitted to present evidence—including a plethora of exhibits, to cross-examine witnesses, and to present argument.

### 3. Double Hearsay

■ At the administrative hearing on Baseball's appeal of the Department's emergency revocation of Baseball's bingo license,

the hearing officer admitted, over Baseball's double hearsay objection, two volumes of evidence upon which Department witness Steve Englert based his notification of emergency revocation. The evidence consists in large part of documents subpoenaed from Baseball and the various satellite companies. Englert did not personally prepare the evidence. Later in the hearing, Robert Muller, who was apparently in charge of the investigation, William Sourkas, Charles Sparks and Dick Kemen—all of whom contributed the evidence contained in the two volume record of evidence—testified regarding those contributions.

Baseball now contends that "[t]he hearing officer overruled Baseball, Inc.'s objection to double hearsay, and and [sic] based her decision solely on inadmissable hearsay." Brief of Appellant at 36. In support of its contention, Baseball cites *Hinkle v. Garrett–Keyser–Butler School District*, 567 N.E.2d 1173 (Ind.Ct.App.:1991), *trans. denied*, for the proposition that "[a]lthough hearsay is permitted in an administrative hearing setting, double hearsay which forms the basis of the hearing officer's decision is not permitted." Brief of Appellant at 36.

■ Once again, Baseball's reliance is misplaced. Our review of *Hinkle* fails to reveal any discussion of double hearsay. Furthermore, the facts are inapposite to those before us as that case was resolved under the Administrative Orders and Procedures Act which provides that hearsay evidence which is properly objected to and does not fall within an exception to the hearsay rule may not form the sole basis of the resulting order. First, this "residuum rule" simply does not prohibit the admission of hearsay, it merely limits its use. Second, 45 IAC 15–5–3(b)(7), discussed above, specifically excludes the Department from the dictates of the Administrative Orders and Procedures Act. Third, 45 IAC 15–5–3(b)(7) specifically states that the hearing was not governed by *any* rules of evidence.

■ In any case, even if the evidence Baseball complains of constitutes double hearsay and even if the residuum rule did apply, that rule has been interpreted as requiring some corroborative evidence to support an administrative order when hearsay has been admitted over objection. *Hinkle*, at 1178. Here, because the various contributors to the evidence testified regarding their contributions, we cannot agree with Baseball's assertion that the hearing officer based her decision *solely* on hearsay.

### 4. Trial Court's Findings of Fact

In conducting its judicial review of the Department's letter of findings wherein the Department sustained six of the seven allegations against Baseball, the trial court issued 107 findings of fact before concluding the evidence before the Department was sufficient to sustain five of the six allegations sustained by the Department in its letter of findings.

Baseball now argues that "[t]he trial court exceeded its scope of authority and supplemented the hearing officer's decision by finding facts that were not within the record before the hearing officer." Brief of Appellant at 40.

■ Baseball first claims that "[t]he trial court's finding of fact numbered 33 is without support in the record." Brief of Appellant at 40. Finding of fact 33 provides:

> In 1994, Big 4 Asphalt's ledger reveals 54 employees; 49 of them had the job of looking for seal coating work according to Eddie Shinn; however, all of these persons were bingo workers and none had been hired by Eddie Shinn.

(R. 498). Our review of the record indicates that this finding is taken almost verbatim from the investigators' interview with Edwin Shinn which is contained in the two volume report which, as we noted in Issue Number 3, was before the hearing officer. (R. 732 and 1762). Furthermore, this information was relied upon by the hearing officer in determining that Baseball was not a qualified organization. (R. 107).

■ Baseball next claims that the trial court's finding of fact number 41, which provides:

> None of the clean-up workers appeared for only 30 minutes of clean-up after a bingo game. Cleaners had to first work the

bingo games and then clean up in order to be paid,

(R. 500), is also without support in the record. Brief of Appellant at 41. The statements of Donald Rodabaugh, Peggy Lee Williams–Jackson, Nancy Drobney, and John Hopkins, which, again, were part of the record before the hearing officer, specifically support this finding. (R. 727–8, 730–1, 1756–7, 1759–60, 2556–62). At least three of these statements were utilized by the hearing officer in determining that Baseball's volunteer bingo workers had been paid. (R. 107–8).

Baseball also claims that "[t]he trial court erred by basing findings of fact upon calculations not within the record," Brief of Appellant at 41, in finding of fact 61, which provides:

From the average gross, Baseball, Inc. paid the affiliated companies $4,977.94 per week in 1994 and $6,786.00 per week in 1993.

(R. 505). This finding of fact is supported by the figures found in the two-volume record of evidence which indicates the amount of money each satellite company received from Baseball in the years 1993 and 1994. (R. 725–6, 1754–5). Thus, while it is true the specific weekly amount paid to the companies was not calculated, we cannot say the trial court's calculations are unsupported by the record which was before the hearing officer. Moreover, the hearing officer specifically relied upon these figures, in part, in determining that Baseball illegally paid its volunteer bingo workers. (R. 107).

Lastly, Baseball claims "[t]he trial court misstated the evidence in finding of fact 75," Brief of Appellant at 41, which provides:

Al Shinn told Bingo works [sic] that bingo workers would not be paid by the bingo hall, but that the workers would be paid.

(R. 507). Baseball contends "[t]here is simply *no* evidence in the record that Mr. Shinn told Bingo workers they would be paid." Brief of Appellant at 41 (emphasis in original). We must disagree. The trial court's finding is specifically supported by the statement of Evelyn Pearl Ripplinger which was before the hearing officer, (R. 727, 1756), and

which was relied upon, in part, by that officer in determining that Baseball was not a qualified organization. (R. 107).

### 5. Testimony of Hearing Officer

At the hearing on the judicial review of the Department's decision upholding the emergency revocation of Baseball's bingo license, Baseball attempted to introduce the testimony of the hearing officer. The trial court refused Baseball's request, and Baseball now complains:

It only makes sense that the hearing officer's testimony concerning specific findings of fact is relevant to a *de novo* review, because the hearing officer is the person who is the only person who can articulate the basis for each finding of fact.

Brief of Appellant at 42.

In support of its contention, Baseball directs our attention to *State Board of Tax Commissioners v. Gatling Gun Club, Inc.*, 420 N.E.2d 1324 (Ind.Ct.App.1981). We agree with the State's assertion that Baseball's reliance upon *Gatling Gun* is misplaced. First, as analyzed by Judge Ratliff in that case, the trial court's judicial review of an agency decision is not *de novo* in the sense that "one might envisage a complete retrial of the issues involved." *Gatling Gun* at 1327 (quoting *Uhlir v. Ritz*, 255 Ind. 342, 344–46, 264 N.E.2d 312 (1970)). Rather, "the reviewing court must go no further than to examine the propriety of the agency's facts as the agency found them and the propriety of the agency's order in light of the facts found." *Id.* at 1328.

Second, the *Gatling Gun* court examined a statutory provision which indicated that the transcript of the proceedings before the State Board of Tax Commissioners to be filed in the trial court conducting the judicial review of the Board's decision "shall not include the evidence compiled by the board with respect to the proceedings." *Id.* at 1329. As a result, this court found that "the evidence must be reconstructed on judicial review through the introduction of the same exhibits, the same testimony of the same witnesses, or the testimony of the hearing officer." *Id.* at 1329. Obviously, *Gatling Gun* simply does not stand for the misleading

proposition advanced by Baseball "that the only witnesses permitted to testify at a judicial review of an administrative hearing are the witnesses who testified at the administrative hearing and the hearing officer." Brief of Appellant at 42.

In any case, our supreme court recently reviewed the general bar against probing the mental processes of administrative decision-makers in *Medical Licensing Bd. of Ind. v. Provisor*, 669 N.E.2d 406 (Ind.1996), and held that "judicial inquiries into the private motivation or reasoning of administrative decision-makers is a substantial intrusion into the functions of the other branches of government." *Id.* at 410. As noted, Baseball sought the testimony of the hearing officer because she was "the only person who [could] articulate the basis for each finding of fact." Brief of Appellant at 42. Clearly, then, Baseball's request was for an impermissible probe into the hearing officer's decision-making process.

At the judicial review hearing, Baseball cited *Gatling Gun* in support of its request for the hearing officer's testimony. The trial court, however, recognized the same distinction this court noted above between that case and the one before it. Furthermore, although it did not base its decision to sustain the Department's objection to Baseball's request for the hearing officer's testimony upon *Provisor*, it did articulate the basis of its decision as follows:

> The Court can't go beyond the information that was put in front of the hearing officer. That is all here.... And the only value I could see to her then would be for her to testify as to what is already before the Court and admitted by agreement.

(R. 669). We find no error.

### 6. Qualified Organization

Prior to July 1, 1996, Ind.Code 4–32–6–20 provided in pertinent part:

> (1) a bona fide religious, educational, senior citizens, veterans, or civic organization operating in Indiana that:
>
> (A) operates without profit to the organizations members;
>
> (B) is exempt from

> (I) taxation under Section 501 of the Internal Revenue Code;
>
> (ii) gross income under IC 6–2.1–3; or
>
> (iii) property tax under IC 6–1.1–10; and
>
> (C) has been continuously in existence in Indiana for at least five (5) years or is affiliated with a parent organization that has been in existence in Indiana for at least five (5) years....

In its initial notification of findings in support of its emergency revocation of Baseball's bingo license, the Department alleged that Baseball was not a qualified organization under I.C. 4–32–6–20 because part of its net earnings impermissibly inured to the benefit of its members and because it did not have a "federal determination letter" thus satisfying "the organizational and operational tests prescribed in Regulation Section 1.501(c)(3)–1(b) and (c)" for tax exemption. (R. 685).

■ Baseball claims:

The hearing officer's determination on this issue was again that Baseball, Inc. was not a qualified organization because it lacked a federal determination letter and '[t]he Department routinely requests organizations to provide a federal letter stating their tax exempt status.' (R. Vol. 1, pg. 106). The trial court, however, found that Baseball, Inc. was not a qualified organization pursuant to I.C. 4–32–6–20(a)(1)(A) and (C) when subsections (A) and (C) of I.C. 4–32–6–20 were never mentioned in any of the initial notices from the IDR.

\* \* \* \* \* \*

Baseball, Inc. is a qualified organization within the meaning of I.C. 4–32–6–20(a)(1)(B) due to its not-for-profit-tax status under I.C. 6–2.1–3. (R. Vol. 7, pg. 1604). The plain language of the statute supports the position that Baseball, Inc. does not have to have a federal determination letter in order to be a 'qualified organization'. The issue of whether Baseball, Inc. qualifies under I.C. 4–32–6–20(a)(1)(C) was never raised, and the trial court erred by finding Baseball, Inc. was not qualified under this section of the statute. Further-

more, there was not substantial evidence of any inurement to private individuals. Brief of Appellant at 42–3.

To begin with, Baseball's claim that the hearing officer determined Baseball was not a qualified organization because it lacked a federal determination letter is misleading. Rather, the record clearly reveals the hearing officer additionally determined Baseball was not a qualified organization because Baseball "produced no other documentation to support their continuous existence for five (5) years," and because "evidence was introduced, and not sufficiently rebutted by BBI, of impermissible private inurement." (R. 106). Thus, the hearing officer obviously found violations of subsections (A)—the organization must operate without profit to the organization's members; and (C)—the organization must have been continually in existence in Indiana for five years.

Secondly, and despite Baseball's contention to the contrary, the initial notification from the Department did reference a violation of subsection (A) of I.C. 4–32–6–20. Specifically, the Department indicated that money which reached the satellite companies from Baseball's coffers were payments "for a non-charitable purpose. In most cases, officers or owners of the for-profit organizations were either officers of Baseball, Inc. or members of their family." (R. 685).

Therefore, even if the trial court did err in affirming the hearing officer's findings that Baseball was not a qualified organization pursuant to I.C. 4–32–6–20(a)(1)(C)—and Baseball offers no supported explanation as to why such could be considered error—that fact is immaterial to the determination that Baseball was not a qualified organization. The same is true for Baseball's assertion that "Baseball, Inc. does not have to have a federal determination letter in order to be a 'qualified organization.'" Brief of Appellant at 43. A careful reading of the statute indicates that to be qualified an organization must be a bona fide organization: (1) that operates without profit to its members; and (2) is exempt from various taxes; and (3) has been in continuous existence for five years. The lack of any of the three requirements, then, renders the organization unqualified.

Here, the record is replete with evidence indicating Baseball members profited from the receipts of the bingo games. During 1993 and 1994, Baseball paid well over $600,-000.00 to the various satellite companies, which were owned or run by Baseball's executive members or their family. The companies were located in a building owned by Baseball and did not pay any rent or utilities. The companies paid "volunteer" bingo workers to work bingo games held by Baseball. The "volunteer" bingo workers were not necessarily also employed by the satellite companies, and many were general members of Baseball. Thus, we find no error.

Affirmed.

CHEZEM and BARTEAU, JJ., concur.

